Mary L. NEUGENT, Appellant,

v.

UNITED STATES DEPARTMENT OF
the INTERIOR et al.

No. 79–2363.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 8, 1980.

Decided Jan. 8, 1981.

As Amended April 11, 1981.

Malcolm W. Houston, Kensington, Md., for appellant.

Leonard Birdsong, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., John A. Terry, Michael W. Farrell, Royce C. Lamberth and Walter J. Postula, Asst. U. S. Attys., Washington, D. C., were on brief, for appellees.

Before MacKINNON and WALD, Circuit Judges, and JUNE L. GREEN *, United States District Judge for the District of Columbia.

Opinion PER CURIAM.

PER CURIAM.

The Republic of Mexico in 1843 issued a land grant in what is now the State of Colorado to two colonizers, Ceran St. Vrain and Cornelio Vigil. This became known as the Las Animas Grant and the St. Vrain-Vigil Grant. It included land along the Arkansas River near the present town of Hasty, Colorado.[1] St. Vrain and Vigil[2] in turn made sub-grants to induce settlers onto the land.

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. David Lavender, in his historical biography entitled "Bent's Fort" (Doubleday) (1954), reports the results of his extensive research into the history of the Las Animas area during the period when a number of the individuals that are here involved were active in the affairs of the region. We do not rely on these facts in any way in arriving at our disposition of this case but merely refer to them in order to present some of the facts in their historical and geographical context. Lavender describes the original St. Vrain-Vigil Grant as follows:

> The northern boundary of the Vigil-St. Vrain grant would be the Arkansas River; its southern limits would lie approximately along the present Colorado-New Mexico border. There would never be certainty as to exactly how much land it covered. The valleys of the Greenhorn, Huerfano, Apishapa, Chuchara, and Purgatory were included, so that in effect most of southeastern Colorado was embraced—at a rough estimate, about four million acres. On January 2, 1844, the Taos justice of the peace reported to Armijo that he had toured the perimeter of the tract with St. Vrain and Vigil, had erected mounds of dirt at the corners, and, having "closed here the boundaries of this grant and having recorded the same, I took them by the hand and walked with them and caused them to throw earth and pull up weeds, and make other demonstrations of possession." Legal fiction, of course. Horsemen could not have

2. See note 2 on page 387.

Following the Mexican War the Treaty of Guadalupe Hidalgo, proclaimed on July 4, 1848 (9 Stat. 922), extended the boundaries of the United States to include the area covered by the St. Vrain-Vigil Grant (9 Stat. 926, Art. V). Pursuant to procedures called for by the terms of said Treaty the United States confirmed the prior Mexican grants to St. Vrain and Vigil by the Act of Congress of June 21, 1860, 12 Stat. 71, 72, entitled "An Act to confirm certain land claims." This Act provided a procedure for recognizing the claims of individuals who acquired their rights as settlers or grantees holding under or taking from St. Vrain-Vigil. In the legislation Congress also limited the confirmation to the amount of land

> circled the territory in a week. It was all wilderness, and worth exactly as much as the possessors could make it worth in the face of the Indians, who blithely continued to assume that the country was theirs, anyhow.
> Foreigner Charles Bent [being a United States citizen] could not, of course, legally share in the grant, but on March 11, 1844, St. Vrain and Vigil quietly conveyed to him by parole agreement a one-sixth interest. [It appears that others also acquired an interest in the Grant.]
>
> .     .     .     .     .
>
> After the United States appropriated the Southwest, the [Mexican] land grants were guaranteed. In September 1857 the surveyor general recommended that the entire St. Vrain-Vigil grant be recognized. In 1860, however, Congress limited all grants to the old Mexican standard of eleven leagues, or 97,390.95 acres. This reduced the St. Vrain-Vigil tract by three quarters. The problem of surveys and squatters' rights led to bitter controversies; .... William [Bent] also held a share in the St. Vrain-Vigil grant, and his claim was recognized by Congress in 1860. *Id.* at 228–29, 403 (footnote omitted).

2. Lavender writes that Cornelio Vigil was Prefect of Taos and the uncle of Ignacio Jaramillo Bent, the wife of Charles Bent, D. Lavender, *supra* note 1, at 165, 279, 393 n.13, who married him about 1835 and lived in Taos. *Id.*, 165. By a prior marriage Ignacio had a daughter, Rumalda Luna. *Id.* Following the American occupation in 1846 of what is now New Mexico, Charles Bent was appointed as its first Territorial Governor. *Id.*, 264. In a subsequent uprising of Indians and Mexicans in Taos in January, 1847 he was murdered and so was Cornelio Vigil. *Id.*, 279–83. Vigil died in Rumalda's arms. *Id.*, 282, 283 n.5.

covered by their original claim, less titles of settlers, and in any event "not more than eleven square leagues [3] to each of said claimants, ... [to] be located in two equal tracts, each of square form, in any part of the tract claimed by the said Vigil [4] and St. Vrain selected by them ...." (12 Stat. 71).

Appellant Neugent is a descendant of Vigil and the great granddaughter of Rumaulda [also written "Rumalda"] Ritc,[5] who claimed both as an heir of Vigil and as a settler to a small claim. Her claim as a settler was denied by the Register and Receiver who, pursuant to Act of Congress, was settling the claims to the land as required by the 1848 Treaty. Ritc then filed an appeal, but no record has been found of the disposition of the appeal.

3. Appellant's brief states that a square league equals 4,428 acres.

4. Although Vigil was killed in 1847, see D. Lavender, *supra* note 1, at 281, his heirs might have exercised his rights. An obvious issue might arise as to the rights of those individuals, such as the Bents, who had acquired interests in the St. Vrain-Vigil Grant.

5. Lavender in Bent's Fort states that Tom Boggs, an unrelated boy whom Charles Bent called nephew, in 1848 married Charles Bent's stepdaughter Rumalda Luna, just turned fourteen. *Id.*, 250. Later "Young Charles Ritz (or Ritc or Rite) married Tom Bogg's daughter Rumalda and joined a settlement in ["the lush bottom lands along the Purgatory [creek]"]." "At first, it was almost a family corporation, with titles drawn through Charles' and William's [Bent] interest in the St. Vrain-Vigil land grant.... Outsiders began buying plots and the town of Boggsville slowly took shape—later it became the modern city of Las Animas [Colorado]." *Id.*, 365.
   Las Animas is on the south bank of the Arkansas River and thus was definitely in Spanish Territory after the 1819 "Treaty of Amity, Settlement, and Limits" with Spain (8 Stat. 252, 253–56) which clarified the southern boundary of the territory acquired by the United States in the Louisiana Purchase. Article III made the southern bank of the Arkansas a boundary. *Id.*, 256. The Louisiana Purchase Treaty of April 30, 1803 with France had merely defined it as "the colony or province of Louisiana, with the same extent that it now has in the hands of Spain." (8 Stat. 202).

Subsequent litigation ensued over claims to various portions of the land by a William Craig, who conveyed to one Henry W. Jones. According to appellant, the United States District Court for the District of Colorado later decided that Craig had been guilty of fraud in obtaining title to the land he claimed. Appellant Neugent has recently investigated this entire matter and uncovered a docket entry in certain land records which recites, *inter alia*:

> Range No. 63 West District of Arkansas Valley
>
> By Whom Patented
>
> *See Letter B # 227 Feby. 2, 1916* [Emphasis added]
>
> Las Amimas Grant Jany 8, 1878 [App. 35]

She also asserts:

> Just a few years past, while researching the Colorado land records Mrs. Neugent, in the company of her husband, found a docket entry which she copies verbatim, "Wm. Craig Patent Revoked. Refer to letter (file) B227, dated February 2, 1916.
>
> This notation appeared as a docket entry on the Bureau of Land Management Tract Record where the Henry W. Jones Tract was recorded. Opposition page 4, Affidavit of Mary Neugent, page 1.
>
> This is a record of the Department of the Interior.
>
> Mrs. Neugent cannot now find this record.

Neugent Br. at 7–8.

These circumstances induced Neugent to file a request under the Freedom of Information Act by letter of June 27, 1977 addressed to the Secretary of the Interior.[6]

---

**6.** Her letter of June 27, 1977 read:

I respectfully request your permission to examine the following land records for lands located in the state of Colorado under the Freedom of Information Act (Public Law 93–502) as amended

1—*Cancelled Land Patent Records with supporting case files* for land patents issued to William Craig and Henry W. Jones. Both Land Patents were revoked in 1916 as shown on your records
(Revocation entries recorded in the Bureau of Land Management Records in Denver, Colorado)
(Enclosed you will find copies of the Recorded Land Patents with accompanying plats)
2—*Records directly resulting from the revocation of these two (2) cancelled land patents* beginning 1916, pertaining to the original claimants since the cancelled Land Patents Records as I have described and outlined in this Freedom of Information Act request affected directly and indirectly [sic]. The title held for lands claimed by my maternal grandmother Rumalda Ritc whose source of title derived from the original claimants
3—*Dept. of Interior Letter # 227 dated July 2, 1916*
(Reference to this letter B # 227 is entered and recorded in the Records of the Bureau of Land Management in Denver, Colorado on the Land Patented to Henry W. Jones)
It is my understanding that since this Patent was revoked in 1916 the Dept. of Interior has been and still is acting as custodian for this land and that any request for access to this letter would have to be made directly to the Dept. of Interior in Wash., D.C. (Enclosed is a copy of plat showing the land held in your custody)

4—*Supportive Case Files for Fiscal Entries* recorded in the "Colorado Tract Book" S.W.—Volume No. 33—Pages 32, 33, 35 and 36 on the land claim of my maternal grandmother Rumalda Ritc.
*Section 24*, township 23 South, Range 52 W. 6 p. m. for $770018.
*Section 26*, T23S, Range 52 West 6 p. m. for $385986.
*Section 27*, T23S, Range 52 West 6 p. m. for $385986.
For your convenience I am enclosing the following:
A—*Copy* of the *legal land description* for the claim of Rumalda Ritc as shown on the abstract and noted in "Colorado Tract Book" S.W. Vol. 33
B—*Copy* of the *Fiscal Entries Recorded* on the claim of Rumalda Ritc as shown in "Colorado Tract Book" S.W. Vol. 33
"Colorado Tract Book" S.W. Volume No. 33 is physically located at the Washington National Record Center in Suitland, Maryland and is the property of the Bureau of Land Management. Wash., D.C.

* * * * * *

The Secretary interprets this as a request for the following:
a. All Land Patent records and supporting case files showing issuance to and cancellation of land patents issued to William Craig and Henry W. Jones, being that Craig and Jones who held patents to portions of the land described in (D) below and whose land patents are shown as "revoked" on the docket entries of the Bureau of Land Management, Denver, Colorado effective in 1916.
b. All records directly, or indirectly, resulting or flowing from the cancellation of

This litigation has eventually settled down principally to a dispute over the letter "B # 227 dated Feby 2, 1916". Originally it was thought that the letter was dated *July 2, 1916*, but the parties now agree that "*Feby 2*, 1916" is most likely the correct date.

However, the Heine Affidavit, upon which the Government's motion for summary judgment largely relied, concludes:

15. From my research, I am convinced that there is no letter file or *letter of July 2, 1916*, the Jones and Craig patents have not been revoked, and there are no "fiscal entries" involving the lands claimed by Ramalda Ritc.

App. 10. (Emphasis added.) This conclusion has two deficiencies. (1) It is not clear whether the Government is still relying on a July 2, 1916 date for the letter. (The Hargett Affidavit has the same deficiency, App. 12, ¶ 4.) It has now been determined that the letter was dated *Feby* 2, 1916, and the Government should address itself to that date if it has not done so already. (2) The Government should also explain its conclusion that "the Jones and Craig patents have not been revoked" (App. 10), in light of the entry with respect to "Wm. Craig" which appears at App. 38, *i. e.*, "Relinquishment to US".[7]

The Government, after spending 27 hours (and undoubtedly more) searching the records, concluded that document B–227 no longer exists. The district court granted summary judgment over the opposing claim by Neugent that the search had been insufficient. On appeal Neugent adduces the definite proof that the letter (or file) once existed to argue that there is a genuine factual dispute as to whether the search was sufficiently thorough. Mrs. Neugent also states that relevant cadastral records in the Government's possession have neither been searched by the Government nor made available to her. The Government has not expressly claimed that it searched the files for a Feby 2 letter.

Cases such as this pose hard problems for courts. We sympathize with both parties since each party is completely sincere and has considerable support in fact and logic for its position. In somewhat similar cases before this court, further investigation has, in some instances, discovered documents that were claimed by the Government to be non-existent on the basis of initial searches. This does not mean that a further search is always required; no easy uniform rule can be applied. In this case, however, after reviewing the parties' opposing contentions and affidavits,[8] we conclude there is a genuine issue of fact, notwithstanding the ex-

---

the said Craig and Jones patents, from 1916 to date, and all records pertaining to the original claimants of the land described in the Craig and Jones patents.

   c. Department of Interior letter B # 227 dated July 2, 1916 being the same letter referenced and recorded on the Bureau of Land Management Records at Denver, Colorado with reference to the land patent of Henry W. Jones.

   d. Supportive case files for "fiscal" (sic) entries recorded in the Colorado Tract Book, S.W. Vol. No. 33 pages 32, 33, 35 and 36 on the land claim, or in any way related to the land claim of the maternal grandmother of Plaintiff, Rumalda Ritc, said claim being at least, Section 24 Township 23

    Range 52 W ($) 770018
    Section 26, T 23S
    Range 52 West ($) 385986
    Section 27, T 23S
    Range 52 West ($) 385986

The land claim of Rumalda Ritc for which records are requested is as shown on the abstract as noted in Colorado Tract Book,

S.W. Vol. 33 as are the copies of the "fiscal" entries referenced to said claim.
(Gov't Br. at 2–3.)

7. The Government's conclusion may be inconsistent with a notation in an obviously old document filed as an exhibit in this case:

   LAS ANIMAS GRANT Col.Ter [Colorado Territory] August 19, 1874 . . .
   Craig Wm.—Papers filed 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 15, 16, 17, 18, 19, 20 & 21
   Copy Tower of Atty. dated Dec. 31, 1862 signed Ceran St. Vrain
   Testimony opinion of R&R
   Argument Printer (Wm Craig)
   *Relinquishment to US*
   Appeal
(App. 38). (Emphasis added.) The "Relinquishment to US" is a very interesting entry.

8. The position of the two parties:
   *The Government.* The government claims it has searched the following files:
   1. Letter files, both in the National Archives and in BLM (App. 8 ¶ 6).

tensive search already made in obvious good faith, as to whether the government has performed a complete search. · The record should indicate that the cadastral records and any other likely source have been thoroughly searched with negative results. Conceivably, these cadastral records already may have been searched, but the govern-

> 2. BLM patent records in Silver Spring, Maryland (p. 9 ¶ 8).
> 3. BLM records at the Colorado State Office (p. 9 ¶ 9).
> 4. "Status plats" from the Colorado State Office (showing "the lands in question are not in the administrative custody of the Bureau of Land Management") (p. 9 ¶ 9).
> 5. The entire (five box) case file for the Las Animas Private Land claim. (The file was borrowed from the National Archives and Mrs. Neugent said she had been through it before) (p. 9 ¶ 10).
> 6. Colorado Tract Book Volume 33 (also borrowed from National Archives) (p. 9 ⸌ 11).
> 7. Secretarial Actions under the Enlarged Homestead Act of 1909 (referred to by Mrs. Neugent as "fiscal entries") (p. 9 ⸌ 11).

The search netted "copies of the a deed [sic] to Ramalda Ritc, Ramalda Ritc's application claiming certain land, and the Register and Receiver's decision rejecting the claim.... [Mrs. Neugent] said that she already had copies of these documents." (p. 10 ⸌ 12).

The government affidavit continues: "The records referred to in this affidavit are all the records known to me which might relate to Mrs. Neugent's request. No records requested by Mrs. Neugent that I could identify and locate have ever been denied to her." (p. 10 ¶ 14).

*The Appellant.* Neugent's Opposition to the Motion for Summary Judgment states:

> There is a set of documents containing a very great deal of information on each such piece of land and which brings the title to date and is known as the "Cadastral Survey Files." These documents, however, are restricted to Bureau of Land Management personnel.
> The plaintiff has never been able to gain access to the Cadastral records encompassing the land in question.
> Exhibit 3 is a set of Bureau of Land Management transmittal records submitted solely for the purpose of showing that the Cadastral records are "restricted to BLM."
>
> .    .    .    .    .
>
> At any rate, the Plaintiff never has had permission granted to see the Cadastral records covering the land in question.
> Not incidentally, at the meeting with Mr. Hein [the government's affiant] with Plaintiff's former counsel present, *it was agreed that the Cadastral records would be at Mr. Hein's office for the meeting, to be seen by*

*her. When the meeting took place the records were not there.* [App. 25–26] [Emphasis added.]

Exhibit 3 (at App. 39) is a letter from the Federal Records Center telling Mrs. Neugent that the documents she seeks are *"restricted to use by personnel of the Bureau of Land Management."* These documents are not there described as "cadastral records." At App. 44, however, "cadastral engineering" survey records are described as *restricted* to the use of BLM and inaccessible to the public without official approval. If the document or reference to it is in the cadastral records their "restricted" character is an insufficient reason for withholding production under the FOIA.

The items included in the FOIA request, including "Cadastral Survey Files and related records," were requested of the Bureau of Reclamation in July 1978. (App. 57.) Requested were documents "regarding the government's acquisition, for the Fryingpan-Arkansas Project, of the Las Animas Land Grant." The Bureau replied "the records you requested are under the jurisdiction of the BLM." (App. 60.) (Aug. 4, 1978.) The BLM, however, said that "Our records do not indicate that any portion of the private land claim (Las Animas) has been reconveyed to the United States. It would seem that if any land are acquired by the Bureau of Reclamation, *that* agency should be able to provide responses to those portions of the letter pertaining thereto." (App. 65, Sept. 1978) (emphasis added). In the meantime appellant is dropped between two stools.

The government does not deny that these cadastral records exist, except perhaps implicitly in the government's affidavit assertion that "No records requested by Mrs. Neugent *that I could identify and locate* have ever been denied to her." (P. 10 ⸌ 14) (emphasis added). Nowhere is there a government assertion that a person in charge of FOIA compliance has looked specifically through these cadastral records and been unable to find them. (*But see* App. 10 ⸌ 4: "The records referred to in this affidavit are *all* the records known to me that might relate to Mrs. Neugent's request." (Emphasis added.) This, however, is conclusory, and unsatisfactorily so in light of all the prior specific references (in the letters of request) to "cadastral" records.) Also, as stated above, Mrs. Neugent claims she was promised an opportunity to see the records but that the promise (apparently) was broken. (App. 25–26, 33.)

ment makes no such positive assertion. We accordingly remand the case to the district court to direct the Secretary to conduct a further search along lines suggested by our comments below. We also direct appellant to be more cooperative as indicated.

*First,* the record is not clear that the search has fully covered what are termed

"Cadastral Survey Files."[9] Appellant claims that these documents are restricted to Bureau of Land Management (BLM) personnel and that because of the restriction placed on these records that her request has not been complied with.[10] On the record before us we are not in a position to evaluate this claim but conclude that the BLM should make further efforts and disclosure with respect to those records and their contents and report fully if unable to find any requested document.

*Second,* a few days before summary judgment was granted appellant had served Interrogatories on the BLM. (App. 14–19). These Interrogatories have never been answered, and we feel, in the interests of clearing up this matter, that they should be.

*Third,* the Heine Affidavit in support of the motion for summary judgment describes an issue that exists between the Interior Department and Mrs. Neugent as follows:

3. On July 7, 1977, Mrs. Mary L. Neugent was in my office . . . [and] made reference to specified documents requested in her letter of June 27, 1977. I advised her that the types of documents she was seeking would be in the custody of the National Archives and would not be found in records that were in the custody of the Department of the Interior and Bureau of Land Management. *Mrs. Neugent insisted that she had been advised by Bureau of Land Management employees in the Colorado State Office that I had the records she wanted in Washington, D.C. Mrs. Neugent also said that Bureau employees in the Colorado State Office had told her that the Jones and Craig patents had been revoked. She refused to inform me of the individuals from which she had received the information.*

App. at 7–8 (emphasis added).

12. At a meeting on April 3, 1978, with Mrs. Neugent, and her attorney . . . I asked her again from whom she had received the information. *She refused to answer my question.*

*Id.* at 10.

Mrs. Neugent may believe that disclosing the name of this employee will hurt him in his employment. We disagree with such conclusion and she should be directed to

---

**9.** A "cadastre" is the official register of the quantity, value and ownership of real estate generally used in apportioning taxes.

Appellant's opposition to motion for summary judgment alleges:

There is a set of documents containing a very great deal of information on each such piece of land and which brings the title to date and is known as the "Cadastral Survey Files".

These documents however, are restricted to Bureau of Land Management personnel. *The Plaintiff has never been able to gain access to the Cadastral records encompassing the land in question.*

Exhibit 3 is a set of Bureau of Land Management transmittal records submitted solely for the purpose of showing that the Cadastral records are *"restricted to Bureau of Land Management".*

It is possible, theoretically to obtain permission to see these records but, the Plaintiff has never been granted permission to see the records in question.

There is a double problem in seeing these records, first it is difficult to obtain permission and secondly one needs to pinpoint the exact records by identifying numbers to get

permission. This comes to a "Catch 22", unless you've seen them you cannot identify them, but you must identify them to see them.

At any rate, the Plaintiff never has had permission granted to see the Cadastral records covering the land in question.

Not incidentally, at the meeting with Mr. Hein with Plaintiff's former counsel present, it was agreed that the Cadastral records would be at Mr. Hein's office for the meeting, to be seen by her. When the meeting took place the records were not there.

Exhibit 4 is a set of letters exchanged by Plaintiff's Denver counsel and the Bureau of Land Management. It shows the restricting of the records.

Exhibit 4(a) provides a detailed itemization of the data included in Cadastral records, which, as can be seen would probably provide much of the requested information.

It also notes the restriction placed on these documents.

App. 25–26. (Emphasis added.)

**10.** *Id.*

disclose the source of her information, if she can, or have her claim suffer.

*Judgment accordingly.*[11]

11. It is hard to believe that the Government's titles files on the land in question will not turn up the document in question which obviously did exist at one time, since it claims to be the present owner, following the land's ownership by Mexican grantees confirmed by the United States. Whether the Government revoked the title is another question.